JOSEPH DANE and another, in equity, *vs.* WILLIAM M. YOUNG and others.

*Liability of stockholders.*

Holders of stock in a bank when its charter expires, are liable, under, R. S. of 1857, c. 47, § 46, to contribute for the redemption and payment of all bills issued by the bank, and remaining unpaid, in the proportion that the number of shares held by them respectively bears to the aggregate number of shares held by all the stockholders.

Under that statute the charter of a bank expires by operation of law when an injunction restraining it from doing business is made perpetual.

A provision in the by-laws of a bank that its "shares shall be transferable by indorsement in writing by the holder in presence of the cashier or two other witnesses," requires that the cashier or two other witnesses shall in writing attest the signature of the holder in order to render the transfer valid between the parties.

Such provision is consistent with the laws of the State and the charter of the Sanford Bank.

BILL IN EQUITY, heard on bill, answers, and proofs.

This bill was brought by the complainants, as receivers of the Sanford Bank, against thirty-six persons alleged to be stockholders of that bank on the eighteenth day of May, 1861, when an injunction against it was made perpetual.

The bank was then found to be utterly insolvent, and after the amount of deficiency was ascertained, this proceeding was instituted to compel a contribution for the purpose of meeting the claims of bill-holders and other creditors, under the provisions of R. S. of 1857, c. 47, §§ 46, 73.

Several of the defendants had assigned their stock in this bank, but the bill charged "that said several assignments not having been made *bona fide* for a valuable consideration, but being colorable, were not effective to transfer such shares of stock so as to relieve said several pretended assignors from the liability aforesaid of those who were stockholders on the eighteenth day of May, A. D.

1861, so that, notwithstanding said supposed transfers, the said several pretended assignors continued to be, and in fact then were, the owners and holders of said shares of stock pretended to be transferred, and held them subject to all the liabilities of the owners and holders of stock in said bank on that day." A great deal of testimony was taken to establish the fraudulent character of these transfers, and the point was elaborately argued, but the decision of the court turned upon their invalidity for other defects, so this became immaterial. The presentation of this cause was delayed till after the decision of that brought by the bank of Mutual Redemption against the directors of Sanford Bank, 56 Maine, 385, as the sum received from the defendants in that case went to diminish the liability of the stockholders.

It was afterwards supposed that this suit would be arranged out of court, which accounts for the tardiness of the determination of the matter—the postponement being by the desire of all the parties litigant.

*Dane & Bourne,* for complainants.

After stating the grounds of the bill and its several allegations and the evidence in support of them, most of which is identical with that in the *Bank of Mutual Redemption* v. *Hill,* 56 Maine, 385, the complainants' solicitors said: "All the defendants who have answered allege that the Mousam River Bank (the name of which was afterward changed to Sanford Bank) had lost 75 per cent of its capital; in other words that its stock had been reduced in value from $50 to $12.50 per share. The truth of this allegation we are not disposed to deny. Indeed, it was on account of such loss that an injunction was issued against that bank Nov. 13, 1857, and continued in force till Aug. 29, 1859, as appears by page 29 of the report. It however appears that about Aug. 29, 1859, some of the defendants, being possessed of a speculative turn of mind and disposed to better their fortunes by a new system of banking, conceived a plan by which to resuscitate the bank and carry their purposes into effect. Accordingly they undertook to

make new stock, or " to make the stock good," as it is expressed; or, more accurately speaking, make it appear to be so. This had to be done to remove the injunction resting upon the bank. Tompson, Emery, Mills, Vose, and Hill put their heads together in council to accomplish this object. Tompson undertook to carry $7,500, Emery $4,000, Mills $7,000 to $10,000, Vose $8,400, and Hill nearly $9,000. They proposed to pay in on the " old stock," so called, i. e., their own shares and that of such stockholders as would surrender them, 75 per cent and thus make the original capital whole. Many of the old stockholders assented to the surrender, and others refused; so it was agreed between the holders of " old stock" and of that " made good " that the latter should be deemed worth the original par value of $50 per share, and the former worth $12.50 per share, and the earnings apportioned on this basis. New certificates were issued to those who had " made good" their stock to mark this distinction. But if honestly conceived and executed in good faith, this arrangement could not relieve the old stockholders of any part of their liability to creditors of the bank, though the answers assume that it had such effect. The parties contemplating the resuscitation of the bank provided themselves with funds, carried the money before Judge Goodenow Aug. 29, 1859, and made it appear to him that they had paid in on this " old stock" $37,500 ($28,191.67 on their own shares and $9,308.33 on those of others who surrendered their old certificates), being the amount necessary to make up the seventy-five per cent loss on the whole capital of the bank, which was $50,000. Having thus obtained a dissolution of the injunction, on their return they took the money immediately from the bank, leaving in place of it their own checks, and then let the bank sleep till May, 1860, because, as. Emery expresses it, " they were not ready to let the notes run through the bank till then." These notes were substituted for the money withdrawn upon their checks, after it was deposited " to make the stock good," were " run through the bank," and others substituted for them till such as had the names of these parties on them as indorsers thereon were withdrawn and the bogus

notes only which came into the hands of the receivers were left in the bank, with certificates of the stock of the bank lodged as collateral. R. S. of 1857, c. 47, § 14. "The whole object of certain parties interested is obvious:" *First.* Nothing lost by paying in and then withdrawing the same money upon checks or notes.

*Second.* By the use of notes of "porters, street laborers, and back-shop men" in Boston, and paying the same when due for a while as they matured in Boston, it was thought easy to get up and manufacture a fictitious reputation for such persons, by means of which to protect the home officers of the bank.

*Third.* To substitute the notes of such irresponsible persons for all those in the bank having the name of any of "the ring" on them, so that there should be left in the bank only bogus notes to represent its capital and the money which had been paid in as capital and to make its capital stock good, including the $12,500 assets of the old stock.

*Fourth.* To take out the bills of the bank upon just such bogus notes. Ceasing to take care of these worthless notes would leave the bills as net profits of the speculation, care being exercised that the bills should be in the hands of other persons when the notes fell due and the bank failed by reason of their non-payment.

The timely injunction of the court, before a very large circulation was afloat, somewhat marred the beauty of this speculation. When this was apprehended some of these defendants transferred their stock. For a characterization of the notes discounted and of the directors who permitted the discount of them, see 56 Maine, 388, 9.

Counsel also argued that, as to three of the defendants, they acted as directors in disposing of the funds of the bank after the alleged transfers of their stock, and were thereby estopped to deny their liability as stockholders. R. S. of 1857, c. 47, § 2.

But all the pretended transfers were invalid upon their face. Not one of them made by Tompson, Mills, and Emery, is executed as required by the by-laws, which also require the surrender of the old and an issue of a new certificate to complete the transfer.

As to the invalidity of the transfer, we cite same cases cited by us in *The Bank of Mutual Redemption* v. *Hill*, 56 Maine, 385, and that case; *Fowler* v. *Ludwig*, 34 Maine, 455; *Fisher* v. *Essex Bank*, 5 Gray, 381; *Union Bank* v. *Laird*, 2 Wheat. 390.

Counsel then argued the fraudulent character of these transfers.

*T. H. Hubbard*, for Justin B. Merrill.

*Increase S. Kimball*, for Samuel B. Emery, William L. Emery, and George Gowen, 2d.

*Howard & Cleaves*, for Samuel Tompson.

Those portions of the argument of the learned counsel for the plaintiffs which seem to dwell with a touch of acrimony on the assumed objects and motives " of certain parties interested " may be based upon things fabulous or true without materially affecting the real issue in this suit. Samuel Tompson was a stockholder; the sole inquiry is whether he owned sixty shares or only ten. He transferred fifty shares March 12, 1861, to Charlotte H. Tompson, *bona fide*, as he swears. The testimony of Samuel B. Emery, put in by complainants, shows this transfer executed in the presence of the cashier. It was not required that the cashier should attest it, or that two other witnesses should do so; it only provided that it should be done " in the presence" of the cashier or of two other persons.

There is neither allegation nor proof that the charter of the bank had expired.

Samuel B. Emery's transfer was made at the bank; presumptively, then, it was made in the presence of the cashier; if not, it was for plaintiffs to prove it, as a contract will be presumed to be properly executed till the contrary appear. *Mussey* v. *White*, 3 Maine, 290. Its bills do not remain unredeemed " by reason of the expiration of the charter of said bank;" it has not expired. W. L. Emery's answer shows he never owned but two shares of this stock. Being uncontradicted, his answer must be taken as true. *Alford* v. *McNarrin*, 44 Maine, 90.

*Dane & Bourne,* in reply. If "these things" to which we re ferred in our opening argument be "fabulous" they do not affect the case; if "true" they do; for they show a design on the part of some of the defendants to absorb the assets of the bank and then to evade their liability as stockholders by turning over to the re ceivers not only a lot of worthless notes but a list of non-resident and bankrupt stockholders. No one of the counsel have attempted to deny the validity of the by-law relative to transfers; each tries to show a compliance with it on the part of his client. This none of them can do, because the meaning of the by-law is that every transfer shall be attested by the cashier, or by two other witnesses. The bill states the facts which in law effect the expiry of the char ter. *Wiswell* v. *Starr,* 48 Maine, 404.

DICKERSON, J. This is a bill in equity, brought by the plain tiffs as receivers of Sanford Bank, under R. S. of 1857, c. 47, § 73, against the defendants as stockholders of said bank, to compel them to contribute to the payment of its debts.

An injunction granted against the bank May 17, 1861, was made perpetual on May 18, 1861, and receivers were appointed on the twenty-first day of the same month. The receivers made their report to the court in January, 1864, which shows an aggregate in debtedness of eleven thousand two hundred and thirteen dollars and eleven cents, three hundred and sixty-seven dollars and fifty cents thereof being due on account, and the balance upon the bills of the bank. The amount and value of the assets of the bank, as reported by the receivers, were two thousand and sixty-eight dol lars and seventy cents. That report was accepted by the court, and the amount of indebtedness was determined in accordance therewith. It thus appearing to the court that the assets of the bank were insufficient to pay its indebtedness it became the duty of the receivers to bring a bill in equity, in behalf of the claimants, against the persons liable as stockholders of the bank to compel them to contribute to the payment of its debts. R. S. of 1857, c. 47, § 73.

The statute creating the liability of stockholders in such cases is as follows: " The holders of stock in any bank at the expiration of its charter, whether a person or corporation, shall be liable in their individual capacities for the redemption and payment of all bills issued by said bank and. remaining unpaid, in proportion to the stock they then hold; but such liability shall continue only two years after notice of such expiration has been given in the State paper." R. S., 1857, c. 47, § 46.

It is substantially alleged in the bill that the charter of the bank expired on the 18th day of May, 1861, when the injunction was made perpetual. In order to give effect to the foregoing provision of the statute it is not necessary that the charter of a bank should have expired by limitation. It is sufficient if it has expired by operation of law. Such expiration takes place when an injunction against the bank is made perpetual. *Wiswell* v. *Starr*, 48 Maine, 404.

In the case at bar the injunction was made perpetual, and the charter of the bank expired on the 18th day of May, 1861; and all holders of stock on that day are liable to contribute for the redemption and payment of all bills issued by the bank and remaining unpaid, in the proportion that the number of shares held by them respectively bears to the number of shares held by all, the stockholders.

The capital stock of the bank was $50,000, which was divided into shares of fifty dollars each.

Of the thirty-six persons alleged in the bill to be liable as stockholders, only nineteen are now claimed to be liable. Of these seven have been defaulted and twelve have demurred. Of the latter number nine have answered.

The alleged causes of demurrer having been presented, considered, and found to be insufficient in *Bank of Mutual Redemption* v. *Hill*, 56 Maine, 388, the several demurrers in this case must be overruled.

Of the defendants who have filed answers to the bill, Samuel Tompson appears by the stock ledger to have owned sixty shares

on March 3, 1860, but he claims that he assigned fifty of those shares to Charlotte H. Tompson on March 12, 1861, as appears by the records of the bank. The plaintiffs deny the validity of that assignment on the ground, 1st, That it was not made in conformity with the requirements of the by-laws, and 2d, That it was not made in good faith.

The by-laws of the corporation provide " that shares shall be transferable by indorsement in writing and subscribed by the holder in presence of the cashier, or two other witnesses, . . . and in every case of transfer the former certificate shall be delivered up to the cashier to be cancelled and a new certificate shall be issued in favor of the transferee."

The statute provides that corporations " may make by-laws consistent with the laws of the State and their charter." We see nothing in these provisions of the by-laws inconsistent with the laws of the State or the charter of the bank. When not thus inconsistent their substantial observance is necessary to the validity of the transfer of the stock between the parties. As by-laws are established by the stockholders they are presumed to understand them. The provisions of the by-laws in question were designed as checks upon fictitious transfers of stock. As stockholders are made liable for the debts of the bank to the amount of their shares, it is important for them to know whether their associates are responsible or worthless. The frequency of the transfers of bank stock and the character of the sellers and purchasers, are oftentimes indicative of the standing of the bank. The requirement that transfers of stock shall be by indorsement of the certificate of stock " subscribed by the holder in the presence of the cashier or two other witnesses," furnishes the other stockholders, and if need be the public, with the means of ascertaining as far as may be the nature of the transaction and the standing of the parties to it. A stock ledger kept in accordance with these provisions of the by-laws affords the most reliable evidence of the condition of the bank ordinarily available to the stockholders; being both lawful and salutary their substantial observance must be upheld.

It is obvious that the actual and mute presence of "the cashier or two other witnesses" at a transfer of stock to be proved by parol, does not answer the purpose of this provision of the by-laws. In such case the stock ledger furnishes the inquiring stockholder with no evidence that the transfer was made "in presence of the cashier or two other witnesses," as required by the by-laws. As the record affords him no means of ascertaining how this fact was, he has a right to presume that the transfer of stock was not duly witnessed. The meaning of this provision of the by-laws is, not only that the holder of the stock shall indorse the certificate of stock when either the cashier or two other witnesses are present, but that he or they shall subscribe their names thereto in attestation of that fact. Otherwise the requirement of the by-laws would be a nullity. When this is not done the property in the stock pretended to be transferred as between the parties still remains in the original holder.

All the transfers of stock made by Samuel Tompson, either in his own right or as attorney of Mary A. Tompson, Charlotte H. Tompson, or George Gowen, 2d, and those made by Samuel B. Emery, not having been duly attested by the cashier of the bank, or two other witnesses, as between the parties, were null and void; nor was it competent for the bank to ratify and make valid such pretended transfers of stock made in violation of its by-laws.

As fifty of the shares alleged in the bill to be owned by Charlotte H. Tompson actually belonged to Samuel Tompson, she could not be chargeable as owner of them also; the inclusion of him as owner is the exclusion of her.

William L. Emery admits in his answer that he was the owner of two shares on the 18th day of March, 1861, but denies that he was then or ever had been the owner of the other twenty shares alleged in the bill. It appears from his answer and proof that the said twenty shares were originally paid for by D. T. Mills, that the original certificate of stock was made out in the name of Emery, and that he receipted for the dividends, though Mills actually received them up to the time of the formal transfer of the

shares to him in March, 1861. It further appears that said Emery made an assignment of the twenty shares in blank when he received his certificate of stock.

The formal transfer of the twenty shares from Emery to Mills was made in accordance with the requirement of the by-laws.

We think that Emery cannot be held as owner of the twenty shares on the 18th day of May, 1861, upon this evidence; though the shares were held in his name he never paid anything for them, and he transferred them to the party who did pay for them when they were issued, before the charter of the bank expired by operation of law. If he had continued to be the nominal holder of the stock when the injunction was made perpetual he would have been estopped from denying his ownership. He would not be permitted to contribute to the furtherance of the scheme of the other managers of the bank for defrauding the public and plundering the stockholders, by allowing them the benefit of the influence of his name as owner of the twenty shares, and then shield himself from liability as owner by denying his ownership when the hour of retribution had come, if he still remained the nominal owner of these shares. As those stockholders only are liable in this suit who were holders of stock on the 18th day of May, 1861, William L. Emery cannot be held liable as owner of more than two shares.

Ivory Brooks, William Ham, and F. H. Butler admit in their several answers to the bill that they owned the number of shares respectively charged therein, but claim to have their liability reduced because of the previous losses of the bank, and the reduction of the value of the shares to twelve and a half dollars each, by a vote of the stockholders passed Aug. 29, 1859.

The par value of the shares was fixed in the charter at $50 each. The fact that the capital stock of the bank had been reduced by losses to twelve and a half dollars each, and that the stockholders so voted, does not change the legal status of these or any other defendants who rely upon this ground of defense. They received and retained their certificates of stock, predicated upon the par value of $50 for each share; and whether the shares were worth

one dollar or fifty dollars each cannot affect their liability as stockholders. The amount of their liability depends not upon the actual market value of the shares or their value as declared by a vote of the stockholders, but upon the number of shares they severally owned, and the amount of the indebtedness of the bank. If a vote of the stockholders reducing the par value of the stock on account of the losses of a bank, whether occasioned by unavoidable misfortune or the culpable mismanagement of the directors, could defeat or diminish their liability in such cases, it might not be difficult, under the manipulations of such men as the managing directors of the Sanford Bank appear to have been, entirely to defeat the security the statute was intended to provide.

It appearing that George Gowen, 2d, and Moses W. Emery never purchased or owned any stock in the Sanford Bank, or received any dividends on such stock or acted as stockholders of the bank, this bill cannot be sustained against them.

The proofs in the case show that the late Hon. Nathan D. Appleton transferred his shares in the bank prior to the 18th day of May, 1861, in accordance with the requirements of the by-laws and in good faith; consequently Julia H. Appleton, the administratrix of his estate, is not liable in this bill.

From the view we have taken of the case it becomes unnecessary to pass upon the question of bad faith in the transfer of stock by some of the defendants, which has been so elaborately and ably argued by the learned counsel for the plaintiffs.

> *Demurrers overruled. Bill sustained with costs against Samuel Tompson as owner of sixty shares, Samuel B. Emery as owner of fifty shares, William L. Emery as owner of two shares, and Ivory Brooks, William Ham, and F. H. Butler, as charged in the bill. Bill not sustained against George Gowen, 2d, Moses W. Emery, and Julia H. Appleton, administratrix, who are respectively entitled to costs.*

APPLETON, C. J.; CUTTING, WALTON, and DANFORTH, JJ., concurred.

NOTE BY DANFORTH, J. I concur in the result to which the opinion arrives, but I prefer to hold the transfers of stock contested invalid on the ground of fraud, rather than from their non-conformity to the requirements of the by-laws of the bank. See *Sargent* v. *Railway Co.*, 9 Pick. 205.